IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

WILLIAM S. WILEY and JILL L. WILEY,   )
        )
    Plaintiffs,     )   TC-MD 160036N
        )
   v.     )
        )
DEPARTMENT OF REVENUE,    )
State of Oregon,     )
        )
    Defendant.     )   **FINAL DECISION[1]**

Plaintiffs appealed Defendant's Conference Decision letter, which was described as a "Notice of Refund Denial for appeal purposes[,]" for the 2010 tax year, dated November 10, 2015. (Def's Ex C at 1, 7.) A trial was held on November 2, 2016, in the courtroom of the Oregon Tax Court in Salem, Oregon. Plaintiff William S. Wiley (William[2]) appeared and testified on behalf of Plaintiffs. Nancy Berwick (Berwick), Tax Auditor, appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 to 19 and Defendant's Exhibits A to L were received without objection.

## I.  STATEMENT OF FACTS

The Conference Decision from which Plaintiffs appealed addressed eight audit adjustments, as well as capital losses and amended return adjustments. (*See* Def's Ex C.) In this appeal, Plaintiffs initially challenged only four of the audit adjustments addressed in the Conference Decision. (Compl at 2.) Subsequently, Plaintiffs limited their challenge to Audit Adjustment #4, which increased Plaintiffs' income for distributions from RASA, LLC (RASA)

---

[1] This Final Decision incorporates without change the court's Decision, entered April 10, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] Although it is customary for the court to refer to parties by their last names, this Decision references two individuals with the same last name, Wiley. To avoid confusion, the court will use the first name of each individual.

and "Wy'East Properties/Wily [*sic*] Cotenancy (Wy'East) by $407,835 in excess of basis as no basis calculation was provided." (*See* Def's Ex C at 3.) After Plaintiffs filed this appeal and provided additional information to Defendant, Berwick determined that William had established his basis in Wy'East and recommended that $215,045 of the additional $407,835 in distribution income be reversed. (Def's Ex D at 1–2.) The $192,790 distribution from RASA remains at issue.

Defendant asks that the court reverse part of Audit Adjustment #3, concerning miscellaneous itemized deductions, allowed by its conference officer. (*See* Def's Ex C at 1–3; Def's Ex D at 1.) Specifically, Defendant asks that "$47,454 of the $53,910 Miscellaneous deductions allowed by the conference officer should be disallowed." (Def's Ex D at 1.) The deductions at issue were described as a $25,000 payment by William to Lyon Financial Services, Inc. (Lyon), three payments to "Dept of Consumer & Business Services" (DCBS) in the amounts of $2,125, $7,156, and $12,948, and a $225 payment to Terry K. Schandel (Schandel), CPA. (Def's Ex C at 3; D at 1–2; H at 4.) Defendant maintains that the $2,125 payment was not to DCBS; rather, it was "a payment of 2006 Oregon income taxes, which is not an expense that is deductible as miscellaneous expense on Schedule A, and would not be deductible to Oregon if it had been included correctly on Schedule A state income taxes." (Def's Ex D at 1.) With respect to the other expenses, Defendant agrees that William paid them, but does not agree that he is entitled to any deduction. (*See id.*)

A.    *Tax Basis in RASA*

As of 2008, RASA was a 50-50 partnership of Plaintiff Jill L. Wiley (Jill) and Wy'East, a corporation. (*See* Ptfs' Ex 6 at 2 (2008 Form 1065 partnership return).) William testified that the shareholders of Wy'East were Robert A. Smith (Bob) and Ronald L. Greenman (Ron).

William testified that RASA was formed in 2008. (*See id.* at 1.) RASA's principal activity was described as "investments." (*Id.*) According to Schedule M-2, the partners contributed $509,323 worth of property in 2008. (*Id.* at 5.) Of that total contribution amount, $254,662 was attributed to Wy'East's capital account and $254,661 was attributed to Jill's capital account on their Schedules K-1. (*Id.* at 11, 14.) A document prepared by Richard C. Hall (Hall), CPA, and described as "RASA's balance sheet and income statement for the year 2008" reported the same. (Ptfs' Ex 7 at 1, 3.) A document tracking Wy'East's investment in RASA listed its capital contribution on January 1, 2008, as $254,661.50. (Ptfs' Ex 8 at 4.) William testified that Hall also prepared that document.

1.      *Initial Contribution: Mid-Valley LLC*

William testified that the contribution to RASA listed on its 2008 return was the asset Mid-Valley LLC, which was previously owned by Adams Lumber. (*See* Ptfs' Ex 2 at 7.) Adams Lumber was an S-Corporation of which William was a 50 percent shareholder in 2007. The other shareholders of Adams Lumber were Bob (32.5 percent) and Ron (17.5 percent). (*Id.* at 12, 17, 31.) William testified that Mid-Valley LLC was formed in 2001 in order to purchase a 50 percent interest in the business Mid-Valley Glass. William testified that, in 2008, he and the other owners wanted to move Mid-Valley LLC out of Adams Lumber to protect it; that is the reason that they[3] created RASA in 2008 and contributed Mid-Valley LLC to it. According to the Schedule L Balance Sheet filed with the 2007 S-Corporation return of Adams Lumber, one of its assets was its tax basis in Mid-Valley LLC, which was reportedly $532,816 at the end of 2007. (*Id.* at 5, 28.) Plaintiffs did not provide the 2008 S-Corporation return of

---

[3] Although RASA's tax filings identified Jill as one of its two partners, William seemed to consider RASA to be his business. He testified that Jill was listed as a partner in RASA in order to protect its assets. As another example of William's view of RASA as his business, a 2008 Debt Acknowledgment signed by William and Bob on December 1, 2008, states that William had "previously transferred for collateral purposes, to secure all amounts payable to Wy'East * * * all of *his interest* in RASA LLC * * *." (Ptfs' Ex 10 at 2 (emphasis added).)

Adams Lumber.

Plaintiffs provided a document entitled "ADAMS LUMBER, INC. BASIS IN CORPORATE STOCK" that tracked each shareholder's basis beginning on April 30, 1998. (Ptfs' Ex 8 at 1–3.) William testified that Hall prepared that document. According to that document, William's "dollar basis" in Adams Lumber as of December 31, 2007, was $586,868.95.[4] (*Id.* at 3.) Following a "[d]istribution of 49% of Mid-Valley equity" in 2008, listed as $525,424.25 to Adams Lumber, William's tax basis in Adams Lumber was reduced by $262,712.13 (50 percent of the value attributed to Mid-Valley LLC) and his ending "dollar basis" balance was $290,612.68 as of December 31, 2008. (*Id.*) However, no such distribution was reported on the 2008 Schedule K-1 issued by Adams Lumber to William.[5] (*See* Ptfs' Ex 12.) William testified that the distribution was reported on Adams Lumbers' 2007 return. (*See* Ptfs' Ex 2 at 4.) The 2007 return reports property distributions totaling $322,200, of which $161,100 was allocated to William. (*Id.* at 4; Ptfs' Ex 11.) Those amounts are also reflected on the shareholder basis spreadsheet in 2007 as "cash distribution to shareholders," though no reference was made to Mid-Valley LLC. (Ptfs' Ex 8 at 3.)

With respect to the amount of $509,323 listed as a contribution to RASA in 2008, William testified that the half contributed to Jill was loaned to her by Wy'East. William testified that he personally guaranteed Wy'East's loans. As proof that he guaranteed Wy'East's loans, William provided a debt acknowledgment signed by William and Bob on December 1, 2008. (Ptfs' Ex 10.) The debt acknowledgment listed William's debts to Wy'East, which included a

---

[4] Prior to 2005, William's "dollar basis" balance had been listed as negative amount every year, as with the other two shareholders. (*See* Ptfs' Ex 8 at 1–2.) In 2005, his balance increased by $500,000, with a note stating "Reversal of 1/1/01 transfer of shares between Wiley & Smith with Wiley contributing his $500,000 note receiv to Adams paid-in cap." (*Id.* at 2.)

[5] Under Box 16, items affecting shareholder basis, the only amount reported was $3,803 representing nondeductible expenses. (*See* Ptfs' Ex 12 at 1–2.)

principal of $325,000 and interest, fees, and costs totaling $136,010. (*Id.* at 1.) William highlighted part of the acknowledgment concerning "Adams' Guaranties and Loans." (*Id.*) It stated that William "and Wy'East hereby reaffirm their respective obligations to be responsible on an equal 50-50 basis for the payment of all loans made to Adams by [William] and Wy'East collectively and the sharing 50-50 of all liability under personal guaranties for any bank loans made to Adams." (*Id.* at 1–2.) A section of the debt acknowledgement entitled "Credits for Payments from Collateral" stated that William had "previously transferred for collateral purposes, to secure all amounts payable to Wy'East * * * all of his interest in RASA LLC * * *." (Ptfs' Ex 10 at 2.) It further stated that, as of December 1, 2008, "Wy'East [had] received * * * a total of $108,000 in the tax distribution payments in 2008 from RASA, $54,000 of which is attributable to [William's] pledged interest."[6] (*Id.*)

Berwick testified that Plaintiffs provided no evidence of a distribution by Adams Lumber to William and no evidence of the fair market value of Mid-Valley LLC. She testified that she assumed the transfer of Mid-Valley LLC was a sale, in which case the fair market value of Mid-Valley LLC is relevant evidence of William's basis in that asset.

2.      *RASA's Tax Filings from 2008 through 2010*

In its initial 2008 return, RASA reported total assets of $1,030,909, comprised of $142,139 cash and $888,770 other investments. (Ptfs' Ex 6 at 1, 5.) In 2008, RASA reported receiving $628,267 of ordinary income from other partnerships, which was entirely attributable to Mid-Valley LLC. (*Id.* at 1, 8.) For the 2008 tax year, RASA issued Schedules K-1 to both Wy'East and Jill, each reporting ordinary business income of $314,006. (*Id.* at 11, 14.) Under each partner's capital account analysis, it listed a current year increase of $260,793 for an ending

---

[6] Neither 2008 Schedule K-1 issued by RASA reported a distribution. (*See* Ptfs' Ex 6 at 11–16.)

capital account balance of $515,455 for Wy'East and $515,454 for Jill. (*Id.*)

Plaintiffs provided a 2009 Schedule K-1 issued by RASA to Wy'East. (Ptfs' Ex 17.) It reported an ordinary business loss of $176,550. (*Id.*) Under the partner's capital account analysis, it listed a capital contribution of $9,070, a current year decrease of $153,755, and a distribution of $130,000, for an ending capital account of $240,770. (*Id.*) Plaintiffs did not provide a copy of RASA's 2009 return or a Schedule K-1 issued to Jill for the 2009 tax year.

Plaintiffs provided a 2010 Schedule K-1 issued by RASA to Jill. (Ptfs' Ex 19.) It reported an ordinary business loss of $21,812. (*Id.* at 1.) Under the partner's capital account analysis, it listed a beginning capital account of $240,769, a current year decrease of $47,978, and a distribution of $192,791, for an ending capital account of $-0-. (*Id.*) Jill's partnership interest was reported at zero percent at the end of the year. (*See id.*) The distribution was categorized as "other property." (*Id.* at 1, 3.) Plaintiffs did not provide a copy of a RASA's 2010 return or a Schedule K-1 issued to Wy'East for the 2010 tax year. According to the document tracking Wy'East's basis in RASA, a transfer of $192,790.8 7 from "Wiley to Wy'East" occurred on June 30, 2010. (Ptfs' Ex 8 at 4.) Thereafter, Wy'East's equity was listed at 100 percent rather than 50 percent. (*Id.* at 4–5.)

B.    *Miscellaneous Itemized Deductions*

Berwick testified that, for the 2010 tax year, Plaintiffs claimed itemized deductions totaling $140,638, including $54,246 miscellaneous itemized deductions. (*See* Def's Ex B at 5; C at 8.) Berwick testified that she did not allow any of the miscellaneous itemized deductions claimed, but the conference officer allowed $53,910. (*See id.*) The Conference Decision stated that the miscellaneous itemized deductions were "substantiated." (Def's Ex C at 2–3.)

Berwick provided documents that she identified as the evidence that William provided

during the audit to prove Plaintiffs' miscellaneous itemized deductions. (*See* Def's Ex H.) One document is a letter dated November 10, 2009, from DCBS to William, dba FUSP LLC, regarding "Workers' Compensation Noncomplying Employer Injury Claim and Civil Penalty." (*Id.* at 1.) It listed the current balance due of $25,025.12 and imposed "additional claims costs charges" of $1,657.50. (*Id.*) Two documents are notices from Defendant dated January 26, 2010, and January 29, 2010, respectively, notifying Plaintiffs that $7,156.49 and $12,948.06 of their refunds had been distributed to DCBS for a "civil penalty." (*Id.* at 2–3.) The January 26, 2010, notice also states that $2,124.50 of Plaintiffs' refund was applied to a debt owed to the Oregon Department of Revenue for personal income tax. (*Id.* at 2.) Another document is a Confession of Judgment in which William was named as a defendant "individually and as guarantor" along with FUSP, Adams Lumber, and William Claussen. (*Id.* at 4.) It states that William "confesses judgment in favor of Plaintiff, Lyon * * * for the sum of $25,000 plus interest at the rate of nine percent (9%) per annum beginning on June 30, 2010." (*Id.*) The final document is a handwritten page of notes. (*Id.* at 5.)

Berwick requests that the court disallow the payments on behalf of FUSP because William's basis in FUSP has previously been increased as a result of his debt guarantees, allowing him to deduct a loss from FUSP in excess of $1.5 million in 2008. (Def's Ex D at 1.) In her view, William "has taken a benefit from the debts more than one time." (*Id.*) Berwick wrote that the $2,125 payment of Plaintiffs' Oregon income tax "is not an expense that is deductible as miscellaneous expense on Schedule A, and would not be deductible to Oregon if it had been included correctly on Schedule A state income taxes." (*Id.*) She wrote that William could not deduct the payment to Schandel because it was on behalf of Wiley & Co S-Corp. (*Id.* at 2.)

According to FUSP's 2008 tax filings, it was a 50-50 partnership of Adams Lumber and Northwest Lumber Products, Inc. at the start of 2008. (Ptfs' Ex 1 at 6, 9.) During 2008, it became a 50-50 partnership of William and William J. Claussen. (*Id.* at 2.) For 2008, FUSP reported total income of $2,230,684 and total deductions of $5,843,905 for an ordinary business loss of $3,613,221. (Ptfs' Ex 1 at 1.) The deductions listed included $417,625 for "rent" and $2,074,054 for "depreciation." (*Id.*) According to its Schedule L balance sheet, FUSP's other liabilities included equipment capital leases totaling $175,278 at the end of 2008. (*Id.* at 5, 13.) On its 2009 return, FUSP reported total income of $155,764 and total deductions of $1,230,026 for an ordinary business loss of $1,074,262. (Def's Ex J at 3.) The only deductions listed were $1,228,386 for depreciation and $1,640 for "other." (*Id.*) No Schedule L balance sheet was provided. The 2009 FUSP partnership return was not its final return. (*Id.* at 1.)

In 2008 and 2009, FUSP issued Schedules K-1 to William reporting his share of the ordinary business losses. (Ptfs' Ex 13, 16.) In 2008, William's beginning capital account was $-0-, his current year decrease was $1,522,337, and he received a distribution of $453,044 for an ending capital account of -$1,975,381. (Ptfs' Ex 13.) The 2008 K-1 did not list William's share of liabilities at year end. (*Id.*) In 2009, William's beginning capital account was -$1,975,381 and his current year decrease was $537,131 for an ending capital account of -$2,512,512. (Ptfs' Ex 16.) It listed William's share of nonrecourse liabilities as $2,387,678 and his share of recourse liabilities as $2,133,544. (*Id.*)

William testified that he guaranteed FUSP's debts and provided copies of guarantees that he gave to Sonoma Pacific Company on January 1, 2008, for a $2,900,000 debt; to Adams Lumber on November 24, 2008, for a $236,009 debt; and to Wy'East on November 24, 2008, for a $25,000 debt. (*See* Ptf's Ex 3, 4.) William testified that the obligation to Lyon was created in

2008 and would probably have been on FUSP's balance sheet as a lease in 2008. He testified that lease payments to Lyon were made and depreciation was taken. William testified that the workers' compensation payment obligation did not arise in 2008, so it could not have been on the balance sheet in 2008. He testified that the hearing on the claim was in 2009.

## II. ANALYSIS

The issues presented for the 2010 tax year are: (1) whether the distribution of $192,790 by RASA to Jill was taxable; and (2) whether William's payment of $25,000 to Lyon for a lease to FUSP; his payments totaling $20,104 to DCBS for a workers' compensation claim; his payment of $2,125 to the Oregon Department of Revenue for personal income tax; and his payment of $225 to a CPA, are deductible as miscellaneous itemized expenses.

With the exception of the personal income tax payment and possibly the payment to Schandel, the distribution and items of expense at issue each pertain to Plaintiffs' partnerships. On those issues, Oregon law looks to provisions of the Internal Revenue Code (IRC) pertaining to partnerships, subject to any modifications under Oregon law. *See* ORS 314.714 (concerning items of partnership income, gain, loss, or deduction); ORS 314.720 (concerning partnership distributions).[7] The burden of proof falls upon the party seeking affirmative relief. ORS 305.427. With respect to the first issue, Plaintiffs are the party seeking affirmative relief and, therefore, bear the burden of proof. With respect to the second issue, Defendant seeks relief from the Conference Decision and, therefore, bears the burden of proof. Each party must prove its claim by a preponderance of the evidence, which "means the greater weight of evidence, the more convincing evidence." *Feves v Dept. of Revenue*, 4 OTR 302, 312 (1971); ORS 305.427. Deductions are "a matter of legislative grace" and taxpayers bear the burden of proving their

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

entitlement to the deductions claimed. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992).

A.      *Basis in RASA*

Due to Plaintiffs' limited evidence and William's somewhat confusing testimony, it is difficult to describe the transaction that occurred in 2010 resulting in the distribution of $192,790 by RASA to Jill. The court finds that Wy'East acquired Jill's partnership interest in RASA. That finding is supported by the spreadsheet tracking Wy'East's interest in RASA, which reported that Wy'East's interest increased from 50 percent to 100 percent in 2010. The court further finds that the purpose of the transfer was to satisfy debts owed by William to Wy'East, as indicated by the debt acknowledgment listing William's interest in RASA as collateral for loans by Bob or Wy'East to William. Thus, the transfer of Jill's interest in RASA to Wy'East was, in effect, a sale for which Plaintiffs received a reduction in the debt that William owed to Wy'East.

ORS 314.716(2) states that, "[u]pon the sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner pursuant to section 741 of the Internal Revenue Code." IRC section 741 provides that, "[i]n the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items)." IRC section 741 applies "even though the sale of the partnership interest results in a termination of the partnership under section 708(b). Thus, the provisions of section 741 shall be applicable * * * to the transferor partner in a 2-man partnership when he sells his interest to the other partner[.]" Treas Reg § 1.741-1(b)[8]; *see also* Rev Rule 99-6, 1999-1 CB 432 (describing the federal tax

_____

[8] IRC section 708(b)(1)(B) states that "a partnership shall be considered as terminated only if – within a 12 month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits."

consequences when, in a two-person partnership, one partner sells its entire interest to the other partner. The partnership terminates under IRC section 708(b)(1)(A) and the transferor partner must report any gain or loss resulting from the sale of its partnership interest).

The gain or loss resulting from a sale under IRC section 741 is "measured by the difference between the amount realized and the adjusted basis of the partnership interest, as determined under section 705." Treas Reg § 1.741-1(a). Thus, the question becomes what was Jill's adjusted basis in RASA at the time she transferred her interest in RASA to Wy'East. Generally, "[t]he adjusted basis of a partner's interest in a partnership shall * * * be the basis of such interest determined under section 722 (relating to contributions to a partnership)" increased by the partner's distributive share of certain income items and decreased by distributions and the partner's distributive share of losses and certain expenditures. IRC § 705(a); *see also* ORS 314.716. "The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time." IRC § 722. "The basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time." IRC § 723.

RASA was formed in 2008 and Jill reported an initial contribution of $254,661 to RASA. William testified that that contribution represented his interest in Mid-Valley LLC, which he received from Adams Lumber and, presumably, gave to Jill. Generally, the basis of property received as a gift is "the same it would be in the hands of the donor or the last preceding owner

by whom it was not acquired by gift[.]" IRC § 1015.[9] Thus, Jill took William's adjusted basis in Mid-Valley LLC. According to the spreadsheet tracking shareholder basis in Adams Lumber, William received Mid-Valley LLC as a distribution from Adams Lumber in 2008. Generally, a shareholder's basis in property distributed by an S-Corporation is the fair market value of the property. *See* IRC § 301(d), 1371(a).

Plaintiffs presented some evidence to show the value of the asset Mid-Valley LLC to Adams Lumber – specifically, the 2007 S-Corporation return listing it as an asset with a value of $532,816 at the end of 2007 and the spreadsheet purportedly tracking shareholder basis in Adams Lumber that identified its value as $525,424.25 at the time of distribution.[10] Oddly, neither of those figures matched the amount contributed by the partners to RASA – reportedly, $509,323. Also troubling is the lack of any evidence to corroborate the value of Mid-Valley LLC reported by Adams Lumber and RASA. No evidence was presented concerning the acquisition of Mid-Valley LLC by Adams Lumber, such as the date or sale price. Even if the court were to rely on the tax filings and spreadsheet – notwithstanding the discrepancies and the lack of any independent evidence – the court finds no evidence that the distribution to William was reflected in Adams Lumber's 2008 tax filings. Indeed, the 2008 Schedule K-1 issued to William omits the distribution of Mid-Valley LLC listed on the basis-tracking spreadsheet. *See* IRC §§ 1367(a)(2)(A), 1368 (requiring shareholders to decrease their bases to reflect distributions). That omission suggests that William failed to recognize for tax purposes any

/ / /

[9] An exception applies for purposes of determining a loss when the donor's basis exceeds the fair market value at the time of the gift.

[10] The basis-tracking spreadsheet described the distribution as of "49% of Mid-Valley equity." (Ptfs' Ex 8 at 3.) It is unclear if that phrase was meant to indicate that Adams Lumber owned only 49 percent of Mid-Valley LLC, or if it distributed 49 percent of its ownership interest.

reduction to his basis in Adams Lumber resulting from the distribution of Mid-Valley LLC. Plaintiffs have failed to meet their burden of proof with respect to Jill's basis in RASA.

B.  *Miscellaneous Itemized Deductions*

Defendant asks that the court reverse its conference officer's allowance of the following miscellaneous itemized deductions: a $25,000 payment by William to Lyon; two payments totaling $20,104 to DCBS; a $2,125 payment to Defendant for Oregon personal income tax; and a $225 payment to Schandel.

1.  *Payment to Lyon*

The $25,000 payment to Lyon was on a debt of FUSP. In the judgment, William was named as a defendant both individually and as a guarantor. He testified that the underlying obligation to Lyon was created in 2008 and would probably have been shown on FUSP's balance sheet because FUSP used the accrual method. Consistent with that testimony, FUSP's 2008 partnership return listed equipment capital leases well in excess of $25,000 as a liability at the end of 2008. In Defendant's view, William is not entitled to deduct his payment to Lyon in 2010 because he received an increase in his basis in FUSP in 2008 based on his debt guarantees (presumably, including to Lyon) and, as a result, he was able to deduct a loss in excess of $1.5 million in 2008 associated with FUSP. (*See* Def's Ex D at 1.)

"Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership." IRC § 752(a). As discussed above, a contribution of money by a partner to a partnership has the effect of increasing that partner's basis in the partnership. *See* IRC § 722. Pursuant to IRC section 704(d), "[a] partner's distributive share of partnership loss (including capital loss) shall

be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred." Based on the foregoing, the court agrees with Defendant that William received a tax benefit associated with FUSP's debt to Lyon in 2008 when he deducted a loss in excess of $1.5 million. William may not, therefore, take another deduction for that debt in 2010.

2.      *Payments to DCBS*

The two payments to DCBS totaling $20,104 were made as a result of a workers' compensation claim against FUSP. The payments were distributed from personal income tax refunds claimed by Plaintiffs in 2010. A letter demanding payment and imposing additional claims costs was issued to FUSP by DCBS in 2009. The letter identified the reason for the demand as "Workers' Compensation Noncomplying Employer Injury Claim and Civil Penalty." (Def's Ex H at 1.)

Defendant argues that those payments – like the payment to Lyon – were expenses of FUSP's and William already received a tax benefit in the form of FUSP losses that he deducted in 2008. (Def's Ex D at 1.) The court disagrees with Defendant that the DCBS liability was shown on FUSP's 2008 partnership return and balance sheet because the liability was not created until 2009. It is unclear whether the liability was reported by FUSP in 2009 because no balance sheet was provided. The only deduction shown on FUSP's 2009 partnership return was depreciation. (Def's Ex J at 3.) In any event, the court agrees with Defendant that the expense was FUSP's and should have been reported by FUSP in 2009, if it was not.

The court has an additional concern about the deductibility of William's payments to DCBS because at least some portion of the payment was identified as a "civil penalty," evidently due to FUSP's failure to carry workers' compensation insurance. Pursuant to IRC 162(f), "[n]o

deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law." Thus, to the extent that William's payment to DCBS represented a civil penalty, it may not be deductible in any event.

3. *Payment of Oregon personal income tax*

A payment of $2,125 was distributed from Plaintiffs' refund to pay Oregon personal income tax. No deduction is permitted for personal incomes taxes paid to Oregon. *See* ORS 316.695(d) (requiring taxpayers to subtract from their federal itemized deductions the deduction for Oregon income tax). Plaintiffs' deduction of $2,125 is disallowed.

4. *Payments to Schandel*

Plaintiffs deducted, and the conference officer allowed, a $225 payment to Schandel. Defendant maintains that the payment to Schandel was "on behalf of Wiley & Co, which is a separate entity, so that expense is not deductible on the individual return but rather on the Wiley & Co S-Corp return." (Def's Ex D at 2.) The court received no documentary evidence from either party concerning that payment. As a result, the court finds no basis to disallow that previously allowed deduction.

## III. CONCLUSION

After careful consideration, the court finds that Plaintiffs have failed to prove by a preponderance of the evidence that the distribution from RASA in 2010 was not taxable. The court further finds that the following miscellaneous itemized deductions must be disallowed for the 2010 tax year: $25,000 paid to Lyon; $20,104 paid to DCBS; and $2,125 paid to Defendant. Now, therefore,

IT IS THE DECISION OF THIS COURT that, as agreed upon by the parties, the distribution of $215,045 received from Wy'East in 2010 was not taxable.

IT IS FURTHER DECIDED that the distribution of $192,790 from RASA in 2010 was taxable because Plaintiffs failed to establish their basis in RASA.

IT FURTHER DECIDED that Plaintiffs' 2010 payments of $25,000 to Lyon; $20,104 to DCBS; and $2,125 to Defendant are disallowed as miscellaneous itemized deductions.

Dated this ___ day of April, 2017.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on April 28, 2017.*